IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

GORDAN BATES,

               Plaintiff,

     v.

STATE OF WISCONSIN - DEPARTMENT
OF WORKFORCE DEVELOPMENT,
STATE OF WISCONSIN - VOCATIONAL
REHABILITATION, ALLIANCE OF IMPARTIAL
HEARING OFFICERS, LESLIE MIRKIN,
MICHAEL GRECO, KAREN LAMBRIGHT,
LINDA VEGOE, MICHAEL SCHNAPP,
DEB HENDERSON-GUETHER, DAVID
BECKER and CLIENT ASSISTANCE PROGRAM,

               Defendants.

OPINION AND ORDER

08-cv-465-slc[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Gordan Bates is proceeding in forma pauperis on two claims: (1) that

defendants discriminated against him because of his disability in violation of Title II of the

Americans with Disabilities Act, 42 U.S.C. § 12132 and (2) that defendants made fraudulent

---

[1] This case was assigned to Magistrate Judge Crocker. Because the parties have not
consented to his jurisdiction, I am assuming jurisdiction over the case for the purpose of
deciding defendants' motion for summary judgment.

representations in violation of Wisconsin's Deceptive Trade Practices Act, Wis. Stat. § 100.18.  Jurisdiction is present.  28 U.S.C. §§ 1331 & 1367.  Before the court is defendants' motion for summary judgment, which will be granted.

I conclude that no reasonable jury could find that defendants violated plaintiff's rights under the Americans with Disabilities Act because the undisputed facts establish that plaintiff is not a "qualified individual with a disability" and that he was not denied a service because of his respiratory disability.  Further, no reasonable jury could find that defendants violated Wisconsin's Deceptive Trade Practices Act because the undisputed facts establish that plaintiff is not a member of "the public" as required for protection under the Act.

Before discussing the merits of defendants' motion, I must address plaintiff's failure to follow this court's summary judgment procedures and the consequences of that failure. In the preliminary pretrial conference order, plaintiff received very specific instructions about how to file and respond to summary judgment motions.  Besides pointing out important procedures, the order warns of the consequences of failure to follow the procedures, stating in part:

> **The only way to make sure that the court will consider your documents is to start early, do them right the first time, and file them and serve them on time.  If you do not do things the way it says in Rule 56 and in the court's written summary judgment procedure, then the court will not consider your documents.**

Dkt. #26 at 6-7 (emphasis in original).  Attached to the order are several procedural

2

documents to help pro se parties like plaintiff prepare or defend summary judgment motions, including a memorandum to pro se litigants regarding summary judgment motions and the court's procedures to be followed on motions for summary judgment. The attachments address issues such as a failure to authenticate exhibits, failure to file proposed facts and failure to properly dispute the other party's proposed facts.

Plaintiff was provided the court's preliminary pretrial conference order and the pertinent attachments in early October 2008. However, the motion for summary judgment plaintiff filed on March 23, 2009, failed to comply with this court's procedures and was denied. Dkt. #47. In the order denying plaintiff's motion, I explained that although plaintiff's motion was being denied, he would suffer no prejudice because he still had time in which to properly respond to the summary judgment motion filed by defendants. I specifically noted, "plaintiff is encouraged to pay strict attention to the court's summary judgment procedures in preparing his response so that his submissions may be considered by the court." Dkt. #47 at 3. However, plaintiff failed to heed the advice.

Plaintiff's submissions run afoul of this court's procedures to be followed on motions for summary judgment in several ways. First, plaintiff disputes some of defendants' proposed findings of fact without referring to any evidence supporting his own version of the facts. The procedural attachment sent to him makes it clear that "[i]f you dispute a proposed fact, state your version of the fact and *refer to evidence* that supports that version."

Dkt. #26 at 18. (Emphasis added.) Furthermore, assuming that some of his responses have support in the record, the procedural attachments make it clear that "[t]he court will not search the record for evidence." Id. at 17. In any case, it appears that plaintiff's failure to follow the court's procedural requirement is not attributable to his failure to understand the requirement. In some of his responses to defendants' proposed findings of fact, he follows the requirement by providing his version of the fact and citing evidence he submitted in an affidavit.

Second, plaintiff included facts in his brief that were not set out in any proposed finding of fact or response to proposed findings of fact. "The court will not consider facts contained only in a brief." Id. at 16. Third, plaintiff attempted to include new facts and arguments in a sur-reply. However, he never sought permission from the court to file his sur-reply and did not give any reason why he should be permitted to file one, in violation of this court's procedures. Id. at 19 ("A responding party shall not file a sur-reply without first obtaining permission from the court. The court only permits sur-replies in rare, unusual situations.") Finally, even if I were to permit his sur-reply, the facts contained therein are inadmissible. Plaintiff includes new facts about his alleged stuttering or Tourette syndrome in his sur-reply. He supports those facts with his own affidavit concerning his medical records. However, as I told plaintiff in the order denying his motion for summary judgment,

if plaintiff wants to submit a copy of portions of his medical records, he must obtain

4

an affidavit from the custodian of the records in which the custodian declares under penalty of perjury or swears under oath that the records are true and correct copies of plaintiff's medical records maintained by the particular medical facility from which he got them.

Dkt. #47 at 2.

The court's summary judgment procedures are like written rules of a game that insure that everyone is playing by the same rules. They also help the court review and address motions by keeping information organized and concise. Without them, parties could submit hundreds of exhibits to the court and send the court fishing for relevant facts. Thus, plaintiff's failure to adhere to this court's procedures to be followed on motions for summary judgment has the following consequences, which are explained in this court's procedures: I will not consider any facts contained only in plaintiff's briefs; I will not consider unauthenticated facts; I will accept as undisputed defendants' proposed findings of fact that plaintiff failed to dispute with a reference to proper evidentiary support in the record; and I will not consider his sur-reply.

However, I note that there is one procedure on which I will give plaintiff some additional leeway. Plaintiff submitted his own affidavit and an affidavit from Carla Lenk. The affidavits include additional facts, some admissible and others inadmissible. Although plaintiff failed to comply with this court's procedures requiring that additional facts be submitted in a responding party's own additional proposed findings of fact and normally

5

"[t]he court will not search the record for evidence," dkt. #26 at 17, I will consider the admissible facts found in his first affidavit and the Lenk affidavit in deciding whether defendants' proposed facts are disputed.  Nonetheless, those facts found in the affidavits do not change the outcome of this case.

I find the following facts to be undisputed and material to deciding defendants' motion for summary judgment.

## UNDISPUTED FACTS

A.  <u>Defendant Department of Workforce Development, Division of Vocational Rehabilitation</u>

The goal of the Division of Vocational Rehabilitation is to provide vocational rehabilitation services for individuals with disabilities.  The Division provides many services, including career guidance and counseling; job search and placement assistance; information and referral services; vocation and other training; assistance in small-business plan development; and post-employment services.

The Division's assistance in small-business plan development services includes providing technical assistance and other consultation services to conduct market analyses, business plan development assistance and other resources to the extent such resources are authorized through statewide workforce investment system.  As part of such services, the

Division must assess the individual's knowledge, ability, motivation and personal commitment to operate a business that generates a competitive wage and will be self-sustaining.  The individual seeking such services must complete a thorough and well-researched business plan for self-employment.  The plan must address all aspects of start-up costs, sources of funding, sufficient resources to leverage start-up capital, ongoing operation cots and likelihood of profitability within a reasonable time frame.  Any financial support provided by the Division is done through grants, not loans.

An individual is eligible for Division services if that person has a disability that makes it difficult for the individual to find or keep a job.  Once an individual is found to be eligible for services, he may have to be placed on a waiting list until he can be assigned a counselor employed by the Division.  The individual works with the counselor to create an individualized plan for employment. The individual chooses his job goal and services needed to reach that goal, and the counselor helps the individual make informed choices.  The plan for employment will contain the steps that the individual must take to reach his goal.

Individuals involved with the Division are informed about the availability of the Client Assistance Program, a program administered by the Wisconsin Department of Agriculture, Trade and Consumer Protection, which is separate from the Department of Workforce Development.  The program helps provide information, assistance and advocacy for individuals who have disputes with the Division.  The program uses negotiation,

7

mediation and a formal appeal process to assist in resolving disputes.

An individual who is dissatisfied with any Division decision about providing or denying services may request a review of the decision through an impartial hearing. An impartial hearing is performed by a hearing officer chosen by the Division and the Wisconsin Rehabilitation Council. A hearing officer's decision is final and must be implemented pending a review by a court, which must be filed within 30 days of the decision.

### B. Plaintiff's Involvement with the Division

On May 3, 2004, the Division determined that plaintiff was eligible to receive services because he has reactive airways dysfunction syndrome. On March 19, 2004, defendant Karen Lambright, a vocational rehabilitation counselor with the Division, met with plaintiff and explained the process of receiving services from the Division. They discussed plaintiff's employment needs and preferences and his interest in architecture as well as his disability and its limitations.

On November 1, 2005, the Division sent plaintiff a letter informing him that he had been taken off the waiting list and that defendant Lambright was his counselor. On November 15, 2005, plaintiff met with Lambright to create an employment plan. They discussed plaintiff's employment history, his education and work background in architecture, his having been an architect in Bosnia before coming to the United States and his desire to

8

obtain architecture-related employment. They developed an employment plan to help plaintiff obtain employment as an architect. Plaintiff was referred to Kyle Stasiak, who worked for the job placement vendor Compass Vocational. On November 29, 2005, Lambright submitted a disbursement request to the Department of Workforce Development to authorize a payment of $900 to Compass Vocational for working with plaintiff in placing him in a job pursuant to his employment plan.

On January 3, 2006, Stasiak sent defendant Lambright an email informing her that she was unable to place plaintiff in a job. On January 20, 2006, Lambright and plaintiff had a meeting to discuss alternative job placement vendors. They were not able to reach any decision about finding more employment opportunities for plaintiff.

On January 27, 2006, plaintiff contacted defendant Linda Vegoe, who is employed by the Wisconsin Department of Agriculture, Trade and Consumer Protection as the director of the Client Assistance Program. Plaintiff informed Vegoe that he wanted to change his employment plan with the Division from job seeking to self-employment so that he could work on starting a small business.

On March 27, 2006, defendant Lambright emailed plaintiff, asking him about his job search and whether he needed further services. He responded in an email that same day, explaining that he had met with defendant Vegoe on January 30, 2006 and was working to change his individualized plan for employment to seeking self-employment. He explained

9

that he would need other services from the Division and that his job search was not going well because he had been unemployed for 12 months. Lambright replied in another email, advising plaintiff to contact her if he wanted business consultation services funded by the Division to determine the feasability of his self-employment ideas.

On May 22, 2006, plaintiff emailed defendant Lambright, explaining that he had made contact with Carla Lenk, a counselor who would help him work on his business plan and communicate with the Division, as Lambright had suggested, and that he wanted to meet with Lenk to discuss his plan and speed up the process even though he was not scheduled to begin consulting with Lenk until July. On July 7, 2006, defendant Lambright noted in plaintiff's file that his individualized plan for employment would be amended to include business consultation services.

In July 2006, plaintiff, Lenk and defendant Lambright met to review plaintiff's draft business plan. They noted that plaintiff needed (1) a membership in a professional architecture organization and attendance at an architecture conference; (2) a referral for legal counseling; (3) a referral for technology assessment; and (4) technology devices, such as a computer. Lambright agreed that she would refer him for legal and technology assessments.

Lenk sent defendant Lambright an email on August 9, 2006 about an appointment she had scheduled with plaintiff on August 15. She noted that plaintiff would bring a revised business plan, that his proposed financial statements would have to be reviewed by

10

a certified public accountant and that he would be traveling to Bosnia in August to retrieve documentation supporting his architecture education and skills. Lenk also noted that she was investigating whether plaintiff needed to be licensed in Wisconsin for his architecture business.

On August 18, 2006, Lenk submitted an interim report on plaintiff to defendant Lambright. In the report, Lenk noted that plaintiff's original business plan had been an outline obtained from the internet that required drastic revisions and that she had worked with him to improve the plan. She noted further that the plan's financial statements had to be reviewed and that an insurance analysis was needed. Plaintiff was also putting together a list of needed equipment for possible purchase by the Division. Additionally, there were problems with plaintiff's obtaining a Wisconsin license for architectural design because he did not have enough "points" and he had received his architecture degree in Bosnia. However, he could start an architecture studio without a license if his designs were restricted to residential applications. Plaintiff also needed a membership in the American Institute of Architects. In late August 2006, Lambright submitted a purchase justification to the Department of Workforce Development authorizing $1300 for a financial consultation with a certified public accountant about plaintiff's business plan.

On September 14, 2006, Lenk emailed defendant Lambright to say that plaintiff's business plan was finished. On October 3, 2006, Lenk emailed Lambright to inform her that

11

plaintiff had been looking at office space.  On October 9, 2006, Lambright sent an email to Mike Gilbert, a supervisor at the Division, asking whether the Division could fund an office space for a year for self-employment.  Gilbert said it could.  On October 10, 2006, Lambright emailed Phil Goodman, a technology consultant, asking him whether he had met with plaintiff about plaintiff's technology needs for his business plan.  Goodman responded that he had spoken with plaintiff but had not met with him.  On October 11, 2006, Lambright reviewed plaintiff's insurance consultation with Jeff Mason, a liability consultant, and submitted a purchase justification authorizing $1250 for the insurance and risk consultation.

On October 18, 2006, plaintiff met with defendant Lambright.  Lambright noted that she would authorize $1500 to Lenk for a website design.  They also reviewed plaintiff's request for $37,804.49 in equipment.  On December 21, 2006, Lenk emailed Lambright to update her on plaintiff's business.  Lenk explained that plaintiff's architecture work had been examined by an architectural firm and that the firm would be a reference on his credentials and sign off on any jobs plaintiff had if a certified architect's review was needed.  Lenk noted that they had discussed what steps plaintiff needed to take to work in the commercial field but that he could work on residential projects for the time being.  Lenk stated further that plaintiff needed to take the American Institute of Architects test, which included seven different tests at the cost of $1200 a test.  Lenk noted that she did not know whether

plaintiff's business plan needed to change but that he had to take the tests in order to succeed.

On January 22, 2007, defendant Lambright reviewed plaintiff's individualized plan for employment with Lenk and noted that she would amend it to include services for the tests plaintiff needed. Lambright scheduled plaintiff's business plan to be reviewed by the business plan committee on February 14, 2007. Lambright spoke with plaintiff and Lenk in mid-February 2007 and plaintiff expressed his desire to proceed with his business and requested money for office space and equipment. Lambright did not believe the Division could provide such services without an approved business plan.

On February 23, 2007, plaintiff requested a meeting with defendant Vegoe and defendant Michael Greco, who was employed as Bureau Director of Consumer Services by the Division. In his request, plaintiff complained that the process for approving his business plan was taking too long. Both Vegoe and Greco provided plaintiff with information regarding his rights and the appeal process used for challenging Division decisions. He was informed that the Workforce Development Area Director, defendant Leslie Mirkin, could review his file.

After reviewing plaintiff's business plan, the business plan committee noted that overall plaintiff had a good business idea but there were some shortcomings. The committee raised several issues, including plaintiff's lack of an architecture license, lack of clarity in the

13

plan, lack of information on warranties and guarantees, insurability, lack of a plan for bookkeeping and a weak analysis of competition.  The committee wanted more information about who would be responsible for business debt, plaintiff's credit history, the current market demand for architecture services and the business's financials.  On March 2, 2007, defendant Lambright forwarded the committee's review to plaintiff.

On March 30, 2007, a meeting was held to discuss plaintiff's business plan, with plaintiff, Lenk and defendants Vegoe and Lambright in attendance.  The three discussed plaintiff's architectural goals and changing his business plan to focus exclusively on residential architecture while he worked to obtain his architect's license.  Lambright raised the topic of funding resources.  Lenk said that she would contact banks and other lenders about possible loans.  Plaintiff explained that he had an immediate need for income and the group discussed plaintiff's seeking employment as a proprietor or subcontractor.

On April 19, 2007, another meeting was held, with plaintiff and defendants Vegoe, Lambright and Deb Henderson-Guenther, who is employed as a complaint investigator for the Client Assistance Program, in attendance.  They discussed information from the National Architectural Accrediting Board and the Wisconsin Statutes confirming earlier advice to plaintiff that although he could perform designing and building with residential work, he could not market himself as an "architect" without a license.  Plaintiff disagreed with this information, became angry and continually interrupted the discussion.  Plaintiff then

14

requested a new counselor from the Division.

On April 16, 2007, defendant Mirkin wrote plaintiff to explain that he should provide reasons for wanting to change counselors and suggesting that plaintiff participate in a neuropsychological assessment to help the Division better maximize his employment success. Plaintiff met with Mirkin on May 2, 2007. At the meeting, plaintiff explained why he wanted a new counselor and Mirkin found the explanation of plaintiff's actions plausible. Plaintiff acknowledged that he could not practice as an architect without a license and noted that he had modified his business plan accordingly. Mirkin agreed to transfer plaintiff to a new counselor, defendant Michael Schnapp, and noted that plaintiff would have to undergo a neuropsychological evaluation if he misinterpreted future communications from the Division. Plaintiff provided Mirkin with a newly revised business plan.

On May 3, 2007, defendant Schnapp contacted plaintiff to introduce himself and to schedule a meeting for May 24, after the business plan committee had reviewed plaintiff's revised business plan. Schnapp and plaintiff met on May 25, 2007 to discuss the business plan and address plaintiff's questions regarding funding from the Division. Schnapp informed plaintiff that the committee had new questions about his revised plan, including questions regarding plaintiff's credit report and financial history and plaintiff's contingency plan if his business was not successful. Schnapp also asked plaintiff whether he had submitted his business plan to banks or other lending institutions. Plaintiff informed

15

Schnapp that he had a bad credit history and did not believe any banks would lend him funds.  Plaintiff also said that he had no backup plan for a business failure because he did not believe that failure was a possibility.  Plaintiff explained that he would consider asking the Division for assistance with half the original start-up business costs he had previously requested if the Division could help him find jobs for his business.  Schnapp explained that many questions about the business plan remained and that he was unsure what funding the Division could provide because of plaintiff's bad credit history.

On June 11, 2007, defendant Schnapp met with plaintiff and Lenk to discuss submitting plaintiff's business plan to banks and other lending or funding sources.  Lenk explained that plaintiff would need some financial leverage from the Division if banks or lending agencies, such as Impact 7, were to consider funding plaintiff's business plan.  Some examples of "financial leverage" for plaintiff included a year of rent and utilities for an office, a year of liability insurance, computer software and hardware and other equipment costs.  Plaintiff and Lenk estimated that the Division would need to provide financial support somewhere in the $35,000 range.

On August 13, 2007, defendant Schnapp met with plaintiff and Lenk to discuss the business plan and disputes plaintiff had with the Division.  Farshad Maltes of Impact 7, an outside lending agency, was scheduled to attend the meeting to provide information on potential financial business assistance but was unable to be present.  At the meeting, plaintiff

16

complained about the Division's business plan process and the length of time it took. Plaintiff asked about receiving funding for his plan from the Division and Schnapp informed him that the Division needed to determine what outside sources could provide assistance, funding and resources for plaintiff's plan before it gave out start-up funds.  Plaintiff was not pleased with this answer.

On September 24, 2007, plaintiff met with defendant Schnapp.  Plaintiff informed Schnapp that he had a potential opportunity for advertising his business with a real estate agent and that he would be meeting with Impact 7 and Lenk to determine what outside funding was available for his business.  Plaintiff asked again what funding the Division could provide but Schnapp could not answer that question without information from Impact 7. On September 26, 2007, plaintiff filed a request for a hearing on the Division's decision.

On October 8, 2007, plaintiff met with defendant Mirkin at plaintiff's request.  At the meeting, plaintiff informed Mirkin that he had filed the hearing request because he was dissatisfied with the handling of his business plan and the Division's failure to fund his business.  Mirkin explained that the Division had not agreed to any fund plaintiff's business but had continued acting in its role of primarily providing technical assistance.  Mirkin explained further that the Division could not agree to provide the funds because of plaintiff's bad credit history and suggested that plaintiff find a job and establish better credit before pursuing self-employment.  Mirkin offered the Division's services for helping plaintiff find

17

employment.  Plaintiff responded that in the past he had always been treated unfairly by co-workers, which resulted in his being fired from jobs and that was why he needed to be self-employed.

Plaintiff said further that in June 2007 defendant Mirkin had committed to funding plaintiff's business in a written note.  Although plaintiff did not have the written note at the time, he brought the note to a meeting scheduled later in the day.  The note stated:

### Supporting a Consumer Interested in Self-Employment

A business must be able to sustain itself.  The business plan must demonstrate how the business will sustain itself and how the business will leverage financial resources.

The business owner must become his or her own best resource.  The business plan must demonstrate how this will be achieved.

[The Division's] role is to provide technical support appropriate to the start up of the business.  The business plan should address what the start up costs are, and address how the business will sustain itself.

The Business Plan needs to be "Bank Ready," to insure that the plan is technically sound and can meet the businesses financial standard for sustainability.  This includes: Concept, Market with a Competitive Analysis, and Financial Feasibility, and must address Accounting systems and all Legal matters.

[The Division's] Financial Participation must insure exploration and use of other financial resources such as: grants, equity grants (leveraging financing), micro lenders, commercial/personal loans.

Leslie Mirkin Aff., dkt. #40, at 8-9, ¶27.  Plaintiff explained that he believed that the statement meant that because of plaintiff's bad credit the Division would provide financial

18

support and he would provide the professional work.  Mirkin noted that he had already explained that start-up funding would not be provided until after plaintiff's business plan had been approved by the business plan committee.

On October 15, 2007, defendant Schnapp met with Lenk and Maltes of Impact 7 about plaintiff's business plan.  Maltes explained that Impact 7 would consider funding plaintiff's business if plaintiff were certified to work as an architect and would provide funding for a computer for plaintiff if he bought the computer through a major company with a warranty.  Maltes stated that if these matters were dealt with, Impact 7 would be comfortable entering into a 50/50 funding arrangement with the Division for equipment for plaintiff's business.

On October 16, 2007, defendant Schnapp met with plaintiff to further discuss his business plan.  They discussed several things, including plaintiff's updated business plan and the meeting that had taken place the day before.  Schnapp informed plaintiff that funding for services in his business plan could not be provided until his plan was approved by the business plan committee.  On October 17, 2007, a pre-hearing conference call was held by an independent impartial hearing officer, defendant David Becker, to discuss plaintiff's appeal of the Division's decisions regarding his business plan.  Plaintiff requested that the Division provide him with $70,000 in services so that he could start his business. Becker asked defendant Mirkin whether the Division would provide the money and Mirkin

19

explained that it could not because plaintiff had not provided a "bank ready" business plan. Becker asked plaintiff and Mirkin to prepare written statements about what plaintiff wanted and why the Division would not grant plaintiff's request.

The hearing was held on November 13, 2007. At the hearing, plaintiff explained that he believed that the Division had misled him and had been untruthful and that he had provided all the proof necessary to support his request for funding. The Division provided evidence that limiting factors in plaintiff's business plan and his personal behavior prevented it from providing the initial investment of the capital and operational costs plaintiff requested. Plaintiff devoted most of his time to explaining the problems he had with the Division and did not provide any justification for his request for $70,000 to start his business. Defendant Becker noted that miscommunication had occurred, plaintiff sincerely wanted to be employed and the Division sincerely wanted to help him reach that goal. He noted further that plaintiff needed to put in writing exactly what he wanted the Division to do to reach his employment goal and the Division needed to make a written statement explaining exactly what plaintiff needed to do to obtain services. Defendant Becker determined that plaintiff was not entitled to the $70,000 in funding to start his business because plaintiff had not provided the necessary evidence required by the Division and that the Division's decision to deny funding was proper. Defendant Becker informed plaintiff that he was entitled to ask a state circuit court or a federal district court to review his

determination but that plaintiff would have to file the petition for review within 30 days.

Plaintiff and defendant Schnapp met on December 18, 2007, to discuss the status of his case with the Division.  Nothing was settled at the meeting.  On January 11, 2008, Schnapp sent plaintiff a letter to clarify the services the Division would provide as part of plaintiff's individualized plan for employment.  Schnapp did not hear from plaintiff again until plaintiff sent him an email on July 11, 2008, requesting a meeting with Schnapp, Lenk and defendant Vegoe.  On August 5, 2008, Schnapp met with plaintiff and Lenk.  At the meeting, Schnapp told plaintiff that the Division would no longer fund consultation services for plaintiff's self-employment but would assist plaintiff in becoming employed through a business or other private employer.  Plaintiff's file with the Division was closed on September 4, 2008 for "failure to cooperate."

OPINION

Under Fed. R. Civ. P. 56, summary judgment is appropriate "when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Goldstein v. Fidelity & Guaranty Insurance Underwriters, Inc., 86 F.3d 749, 750 (7th Cir. 1996) (citing Fed. R. Civ. P. 56); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  The district judge's function in a summary judgment motion "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there

21

is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 249.  Additionally, "it is the substantive

law's identification of which facts are critical and which facts are irrelevant that governs."

<u>Id.</u> at 248.  Furthermore, all reasonable inferences from undisputed facts should be drawn

in favor of the nonmoving party.  <u>Baron v. City of Highland Park</u>, 195 F.3d 333, 338 (7th

Cir. 1999).  However, the nonmoving party cannot simply rest upon the pleadings once the

moving party has made a properly supported motion for summary judgment; instead the

nonmoving party must submit evidence to "set out *specific* facts showing a genuine issue for

trial." Fed. R. Civ. P. 56(e) (emphasis added).

A.  <u>Title II of the Americans With Disabilities Act</u>

Plaintiff contends that defendants refused to provide plaintiff with the benefits of

vocational rehabilitation services because of plaintiff's disability.  Title II of the Americans

with Disabilities Act is referred to as the public services portion of the Act and provides that

> no qualified individual with a disability shall, by reason of such disability, be excluded
> from participation in or be denied the benefits of the services, programs, or activities
> of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  The Act defines "qualified individual with a disability" as

> an individual with a disability who, with or without reasonable modifications to rules,
> policies, or practices, the removal of architectural, communication, or transportation
> barriers, or the provision of auxiliary aids and services, meets the essential eligibility
> requirements for the receipt of services or the participation in programs or activities
> provided by a public entity.

22

42 U.S.C. § 12131(2).  The regulations enforcing Title II of the Act provide additional definitions of important terms: (1) "disability" is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual;" (2) "physical or mental impairment" is defined as "[a]ny physiological disorder or condition . . . affecting one or more of the following body systems: . . . respiratory (including speech organs)[;]" and (3) "major life activities" is defined as "functions such as . . . breathing . . . ."  28 C.F.R. § 35.104.

Defendants' first argument is that the Eleventh Amendment bars plaintiff's ADA claim.  This argument is based on defendants' characterization of plaintiff's ADA claim as a failure to accommodate claim.  Defs.' Br., dkt. #36, at 5-6 ("To the extent that Bates' complaint alleges a failure to accommodate his disability, his claim is barred by Eleventh Amendment immunity . . . .").  However, that characterization is incorrect.  Plaintiff was granted leave to proceed on his claim stemming from allegations that defendants denied him services because of his disability, not because defendants failed to accommodate his disability.  I will ignore defendants' Eleventh Amendment argument because it does not apply to plaintiff's ADA claim.

Defendants contend that there is no evidence that plaintiff has a "disability." However, it is undisputed that plaintiff was eligible to receive services from the Division of Vocational Rehabilitation of the Wisconsin Department of Workforce Development because

23

he had reactive airways dysfunction syndrome, which is comparable to asthma.  Further, Dr. Patrick Dowling's affidavit provides medical evidence that plaintiff suffers from reactive airways dysfunction syndrome and that the syndrome causes plaintiff to endure an impairment of between 25% and 75% of his respiratory function.  This evidence is enough for a reasonable jury to determine that plaintiff has a physiological condition affecting his respiratory system that substantially limits his breathing.

I note that plaintiff contends that in addition to his respiratory disability he has a speech impediment.  There is some mention in the record that plaintiff stutters.  However, there is no evidence that plaintiff's stuttering substantially limits any major life activity.  Thus, plaintiff's respiratory disability is the only "disability" that I will consider in connection with his ADA claim.

Although there is evidence from which a reasonable jury could find that plaintiff has a "disability," there is no evidence that he is a "qualified individual with a disability."  The only service or benefit plaintiff wanted but did not receive from the Division of Vocational Rehabilitation was start-up money, such as money for renting office space and purchasing equipment, but there is no evidence that plaintiff ever met the "essential eligibility requirements" for receiving start-up money.  The evidence supports the opposite conclusion, that is, that regardless of any disability, plaintiff never satisfied the requirements for obtaining start-up money.  Thus, no reasonable jury could find that he is a "qualified

24

individual with a disability" under the Act.

The undisputed facts establish that although there was some miscommunication about plaintiff's need for an architect's license to implement his business plan (he did not need one initially to do residential work, but planned to obtain one eventually), the Division's business plan committee found plaintiff's business plan in need of several revisions before it would approve the plan, including more information on obtaining insurance and bookkeeping, inclusion of photos of completed projects plaintiff had worked on, a copy of his credit report and information on his ability to fund the business and his contingency plan if the business was not successful.  Plaintiff never made all the requested revisions.  Further, the Division later determined that it could not provide plaintiff with the money he requested because he had a bad credit history, which suggested a poor chance of running a successful business because he would have a difficult time obtaining the credit necessary to run a business.  Plaintiff never improved his credit.  Accordingly, plaintiff never met the requirements for obtaining a grant of start-up money for his business.

There is no evidence in the record from which a reasonable jury could infer that the Division denied plaintiff's request for start-up money because of his respiratory disability. In fact, it was plaintiff's disability that qualified him to receive any services from the Division.  Although plaintiff initially sought services from the Division that would help him find employment, he later requested services that would help him achieve self-employment

25

by starting a business.  The Division helps clients start a business by providing small-business

plan development services, such as technical assistance, business plan development and other

authorized resources, such as financial resources.  According to the undisputed evidence,

plaintiff received all of the services.

Instead of evidence of discrimination because of plaintiff's disability, the undisputed

facts establish that there was confusion and miscommunication about what the Division

agreed to provide plaintiff.  Plaintiff wanted only financial support and he believed that his

business plan was good, would produce a successful business and entitle him to a grant of

start-up money from the Division without any revisions.  The Division was offering to

provide technical assistance and business plan development services to plaintiff to help him

obtain self-employment by starting a small business.  The Division also offered some

financial assistance and considered providing start-up money if plaintiff took steps to

improve his business plan.  However, plaintiff did not want technical or business plan

development assistance.  Plaintiff disagreed with the Division's decision that his business

plan was not "bank ready" and with its denial of the $70,000 in start-up money he

requested.  This disagreement is not a discrimination problem.

Regardless of plaintiff's disagreement with the Division's decision, no reasonable jury

could find that plaintiff is a "qualified individual with a disability" or that he was denied a

service because of his respiratory disability.

26

## B.  Wisconsin's Deceptive Trade Practices Act

Plaintiff contends that defendants violated Wisconsin's Deceptive Trade Practices Act, Wis. Stat. § 100.18, by making fraudulent representations about providing plaintiff with a business loan.  Under the Act,

> No person, firm, corporation or association, or agent or employee thereof, with intent to sell, distribute, increase the consumption of or in any wise dispose of any . . . service, or anything offered by such person, firm, corporation or association, or agent or employee thereof, directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, sale, hire, use or lease of any . . . service, shall make . . . or cause, directly or indirectly, to be made . . . [a] . . . statement or representation of any kind to the public relating to such purchase, sale, hire, use or lease of such . . . service . . . or to the terms or conditions thereof, which . . . statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

Wis. Stat. § 100.18(1).  To prove a fraudulent representation claim brought under this statute, a plaintiff has to prove three elements:  (1) "that with the intent to induce an obligation, the defendant made a representation to 'the public,'" (2) "that the representation was untrue, deceptive or misleading," and (3) "that the representation caused the plaintiff a pecuniary loss."  K&S Tool & Die Corp. v. Perfection Machinery Sales, Inc., 2007 WI 70, ¶19, 301 Wis. 2d 109, 121-122, 732 N.W.2d 792, 798.

Defendants contend that they are entitled to summary judgment on plaintiff's Deceptive Trade Practice Act claim for several reasons.  I need not address them all because there is no evidence from which a reasonable jury could find in plaintiff's favor on the first

27

element of a statutory fraudulent representation claim.  Even assuming that defendants made untrue, deceptive or misleading statements to plaintiff, the undisputed facts require the conclusion that plaintiff was not a member of "the public."

The Act does not define the phrase "the public."  It is clear that a statement made to an individual may be a statement made to "the public."  <u>State of Wisconsin v. Automatic Merchandisers of American, Inc.</u>, 64 Wis. 2d 659, 664, 221 N.W.2d 683, 686 (1974).  Although the Wisconsin courts have not formed a "bright-line test" for determining when a plaintiff is not a member of "the public," the important factor is the particular relationship between the parties.  <u>K&S Tool & Die Corp.</u>, at ¶27, 301 Wis. 2d at 125, 732 N.W.2d at 800.  Thus, whether a particular relationship exists depends on whether the facts and circumstances of the case establish the existence of a "'peculiar relation between the defendants and the prospective purchasers which would distinguish the prospective purchasers from 'the public' which the legislature intended to protect.'"  <u>Id.</u>, at ¶23, 301 Wis. 2d at 123, 732 N.W.2d at 799 (quoting <u>Automatic Merchandisers</u>, 64 Wis. 2d at 664, 221 N.W.2d at 686); <u>see also</u> <u>Uniek, Inc. v. Dollar General Corp.</u>, 474 F. Supp. 2d 1034, 1039 (W.D. Wis. 2007) ("The standard suggested in <u>Automatic Merchandisers</u>, is whether the plaintiff had a relationship that would somehow "distinguish" it from any other party.").  For example, in <u>Automatic Merchandisers</u>, 64 Wis. 2d at 663, 221 N.W.2d at 686, although the representations were made privately to prospective purchasers, those purchasers were not

distinguishable from "the public" because "their only relationship to the defendants was that they had responded to advertisements in the classified sections of newspapers."

In this case, the undisputed facts establish that plaintiff had a particular relationship with the Division of Vocational Rehabilitation that distinguishes him from "the public" for purposes of the Act. Plaintiff sought out the Division's services in 2004 initially not because the Division was advertising business loans for small businesses, but because plaintiff wanted help finding a job in the field of architecture. In November 2005, plaintiff agreed to an individualized plan that would assist him in finding such employment. In January 2006, plaintiff decided that he wanted to be self-employed and start his own small business using his architecture skills. In July 2006, his employment plan was updated to include business consultation services. Plaintiff agreed to meet certain requirements in preparing a business plan and the Division agreed to provide a range of services to help him reach self-employment through his proposed business. It was in the fall of 2006 that potential misrepresentations were made about providing plaintiff funds for office space and equipment. By then his relationship with the Division was particular enough to distinguish him from "the public." He had been working with it for two years and since January 2006 had been involved in a back-and-forth relationship with it about his business plan. Any statements defendants made to plaintiff regarding the funding of his business occurred after he had accepted their general services to help him start a small business. Thus, plaintiff was

29

no longer a member of "the public" when the alleged false statements about providing him start-up money were made.

Further, I note that plaintiff's situation distinguishes him from "the public" in another respect.  His situation is far from the type the Act was intended to protect against. E.g., Automatic Merchandisers, 64 Wis. 2d at 665, 221 N.W.2d at 686-87 ("Section 100.18(1) is aimed at protecting the public from untrue, deceptive or misleading representations made in sales *promotions*."); Bonn v. Haubrich, 123 Wis. 2d 168, 173, 366 N.W.2d 503, 505-06 (Ct. App. 1985) ("The intended purpose of § 100.18(1) is to protect consumers from untrue, deceptive or misleading representations made to *promote* the sale of a product."); Kailin v. Armstrong, 2002 WI App 70, ¶44, 252 Wis. 2d 676, 710, 643 N.W.2d 132, 149 (Ct. App. 2002) ("The purpose of § 100.18 is aimed at untrue, deceptive, or misleading statements made to *induce* certain actions.").  Plaintiff's situation involves alleged untrue representations made in the course of his obtaining free assistance from a government agency, not when he purchased some item or agreed to some obligation of services.  Defendants were not trying to promote any product or induce plaintiff to do anything for their benefit.  Accordingly, defendants' motion for summary judgment will be granted.

30

ORDER

IT IS ORDERED that defendants' motion for summary judgment, dkt. #35, is GRANTED; the clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 23rd day of June, 2009.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge

31